**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Albert Kuck, ) | No. CV 08-0756-PHX-DGC (JJM) |
|     Plaintiff, ) | **ORDER** |
| vs. ) | |
| Dora Schriro, et al., ) | |
|     Defendants. ) | |

Plaintiff Albert Kuck filed this civil rights action under 42 U.S.C. § 1983 against various officials of the Arizona Department of Corrections (ADC). (Doc. #1.) Defendants Rollins and Sternes move to dismiss for failure to serve. (Doc. #36.) Defendants Schriro, Franco, Watson, Miller, Haley, Crouch, and O'Bryant move for summary judgment.[1] (Doc. #37.) The motions are ready for ruling. (Doc. ##41, 48, 49.) The Court will grant Defendants' Motions and terminate the case.

**I.     Background**

In Count I, Plaintiff alleged that his repeated assignment to alternate placements, rather than long-term protective segregation (PS), pursuant to policies promulgated by Schriro and enforced by Rollins, Haley, Sternes, Watson, Miller, Crouch, and O'Bryant, and

---

[1] The Court issued an Order regarding Plaintiff's obligation to respond to the Motion to Dismiss and an Order, required under Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998) informing Plaintiff of his obligation to respond to the Motion for Summary Judgment and the evidence necessary to rebut Defendants' contentions. (Doc. ##39, 40.)

despite knowledge that Plaintiff is a Security-Threat-Group (STG) target, resulted in repeated attacks against him by other inmates. He alleged that he sought PS placement three times, the last following an assault in January 2008. He also claimed that his repeated assignment to PS reviews alerts inmates in general population (GP) of his status as an STG target and increases the risk of further assaults when he is eventually returned to GP, even in an alternate placement. He further alleged that Defendants continued this practice, increasing the number of GP inmates who know of Plaintiff's PS reviews and increasing the likelihood of further assaults if he is returned to GP. The Court directed Defendants to Answer Count I and dismissed the remaining claims and Defendants. (Doc. #4.)

Thereafter, the Court dismissed claims for denial of the November 2005 and January 2007 requests for placement in PS. (Doc. #21.)

Rollins and Sternes now move to dismiss on the grounds that they have not been served as required by Federal Rule of Civil Procedure 4(m). (Doc. #36.) Schriro, Franco, Watson, Miller, Haley, Crouch, and O'Bryant move for summary judgment on the grounds that (1) they did not violate Plaintiff's Eighth Amendment rights, (2) Plaintiff is not entitled to punitive damages, and (3) Defendants are entitled to qualified immunity on the damages claims. (Doc. #37.)

## II. Motion to Dismiss

Federal Rule of Civil Procedure 4(m) provides that if "a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against the defendants or order that service be made within a specific time." Rollins and Sternes have not been served. (Doc. ##6, 7.)

Plaintiff filed a single response to both pending motions, stating that the response to the Motion to Dismiss would be the same information as the response to the Motion for Summary Judgment. (Doc. #41 at 1-2.) But, as Defendants note in their reply, Plaintiff makes no argument regarding the failure to serve Rollins or Sternes. (Doc. #49.)

The Complaint was filed on April 21, 2008, and the screening Order was issued on

June 11, 2008. Because Rollins and Sternes have not been served as required by Rule 4(m) and Plaintiff offers no explanation for that failure, Rollins and Sternes will be dismissed without prejudice.

**III.  Motion for Summary Judgment**

    **A.  Legal Standards**

        **1.  Summary Judgment**

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 250; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995). Rule 56(e) compels the non-moving party to "set out specific facts showing a genuine issue for trial" and not to "rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). However, Rule 56(c) mandates the entry of summary judgment against a party who, after adequate time for discovery, fails

1  to make a showing sufficient to establish the existence of an element essential to that party's
2  case and on which the party will bear the burden of proof at trial. Celotex, 477 U.S. at 322-
3  23.

4  When considering a summary judgment motion, the court examines the pleadings,
5  depositions, answers to interrogatories, and admissions on file, together with the affidavits,
6  if any. Fed. R. Civ. P. 56(c). At summary judgment, the judge's function is not to weigh the
7  evidence and determine the truth but to determine whether there is a genuine issue for trial.
8  Anderson, 477 U.S. at 249. The evidence of the non-movant is "to be believed, and all
9  justifiable inferences are to be drawn in his favor." Id. at 255. But, if the evidence of the
10 non-moving party is merely colorable or is not significantly probative, summary judgment
11 may be granted. Id. at 248-49.

### 2. Threat to Safety

13 "[P]rison officials have a duty . . . to protect prisoners from violence at the hands of
14 other prisoners." Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005) (internal
15 quotations omitted). To prevail on an Eighth Amendment failure-to-protect claim, a plaintiff
16 must demonstrate facts that satisfy a two-part test showing that the defendant was
17 deliberately indifferent. First, the plaintiff must prove that objectively he suffered a
18 sufficiently serious deprivation. Wilson v. Seiter, 501 U.S. 294, 298 (1991). Then, he must
19 prove that the defendant had a culpable state of mind—was deliberately indifferent—in
20 allowing the deprivation to occur. Id. at 299.

21 A prison official has a sufficiently culpable mind if he "knows of and disregards an
22 excessive risk to inmate health or safety; the official must both be aware of facts from which
23 the inference could be drawn that a substantial risk of serious harm exists, and [the official]
24 must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994); Gibson v.
25 County of Washoe, 290 F.3d 1175, 1187-88 (9th Cir. 2002). Where an inmate's claim is
26 based on the alleged failure to prevent harm, the inmate may satisfy the "sufficiently serious"
27 requirement by showing the existence of "conditions posing a substantial risk of serious
28 harm" to him. Farmer, 511 U.S. at 834. To prove knowledge of the risk, the prisoner may

rely on circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to establish knowledge. See id. at 842; Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).

### B. Parties' Contentions

#### 1. Defendants

In support of their motion, Defendants submit their Statement of Facts (Doc. #38 (DSOF)); Plaintiff's ADC Adult Inmate Management System (AIMS) Report (Doc. #51, Ex. A); the declaration of Haley (id., Ex. B), with attachments (Doc. #50), including Director's Instruction (DI) #67—Protective Segregation (id, Attach. 1) and Plaintiff's PS documents (id. Attachs. 2-16); and excerpts from Plaintiff's deposition (id., Ex. C, Pl. Dep. Oct. 28, 2009).

At the time relevant to Plaintiff's Complaint, the ADC's PS process was set out in DI 67. (Doc. #51, Ex. B, Haley Decl. ¶ 12, Doc. #50 Attach. 1.) Placement in PS is carefully scrutinized—officials must screen inmates to assure they are not attempting to infiltrate protective custody to harm someone already there. (Id. ¶ 14.)

An inmate in need of protection can be placed in PS, transferred to another prison unit, or transferred to a unit designed for vulnerable inmates. (Id. ¶¶ 15, 16, 17.) The greatest degree of protection is afforded by PS status, i.e. placement in a unit that houses other inmates identified as having safety concerns. (Id. ¶ 15.) Alternatively, an inmate can be transferred to a different prison unit if an inmate has a conflict with particular inmates, but is otherwise able to live among other prisoners. (Id. ¶ 16.) Once an inmate is determined to pose a threat to the safety of another inmate, he is included on the inmate's "Do Not House With" ("DNHW") list and they are not housed where they would have contact with each other. This information is included in the inmate's computerized AIMS file. (Id.) Another possible protective arrangement is to transfer an inmate to a unit designed specifically for vulnerable inmates. (Id. ¶ 17.)

When an inmate requests protection, he is immediately isolated in a safe, secure area and then moved to a detention unit. The Shift Commander initiates the PS screening process

by completing the necessary paper work, including a statement from the inmate and investigation report, and forwarding all documents to the Deputy Warden (DW). (Id. ¶¶ 19-21.) The inmate's previous requests for PS are obtained from the Central Office. (Id. ¶ 22.) The DW reviews the documentation and determines whether the inmate's case requires a full PS review, which is an in-depth process involving an investigation by the Criminal Investigation Unit (CIU). (Id. ¶¶ 23-24, 26.) If further investigation is not required, the DW assures that the inmate's DNHW list is up to date and documented, and the inmate is notified of the decision. The inmate can appeal within 3 days to the Warden. (Id. ¶ 25.)

If a comprehensive PS review is needed, the DW forwards the PS file/documents to the CO IV, who interviews the inmate and sends documents to CIU. (Id. ¶ 26.) The CIU interviews the inmate and prepares a report, which goes to the DW. The DW determines if there is a threat, makes a recommendation, and forwards everything to the Warden, who does an independent review and recommendation. (Id. ¶ 30.) The Warden forwards the packet to the PS Administrator at the ADC Central Office. The PS Administrator and PS Committee review the packet for final determination. (Id. ¶ 31.) The inmate can appeal the decision of the PS Committee to the Division Director for Prison Operations. (Id. ¶ 35.)

Defendants contend that Plaintiff had three DI 67 reviews: November 18, 2005; January 19, 2007; and January 10, 2008.[2]

### *a.* *2005 PS Request*

On November 18, 2005, at the ASPC-Winslow, Kaibab Unit, two inmates assaulted Plaintiff, so staff recommended Plaintiff go through the PS process. (Id. ¶ 37.) During the investigation, officials learned that Plaintiff, a White Supremacist, had a $2,500 drug debt with the New Mexican Mafia. (Id. ¶ 38.) He was ordered by the "White Power" inmates to stop using drugs until he paid his debt, but he continued to use drugs and ran up more debt. (Id.) Plaintiff was offered PS status but he refused it, stating that he knew he would be

---

[2]Although the specific claims regarding denial of PS in 2005 and 2007 have been dismissed, the Court will summarize all three PS requests because Plaintiff claims that his repeated assignment to alternative housing instead of PS has increased the threat to him.

1 reclassified higher, be sent to lockdown, and when that happens, his mother would be able to pay off his drug debt and that he expected the whole thing to blow over. (Id. ¶ 39.)

The DW, Warden, and PS Committee, chaired by Haley, all determined that alternative placement away from Kaibab with names added to his DNHW list was appropriate. (Id. ¶¶ 40-42.) It was noted that the issue appeared to be isolated to Kaibab, and Plaintiff stated he was not asking for PS, but was requesting to go to another GP location. (Id.) Plaintiff waived his right to appeal the decision. (Id.)

### b. 2007 PS Request

On January 19, 2007, Plaintiff requested PS status while housed at the ASPC-Tucson, Rincon Unit, due to a perceived threat to his safety resulting from his 1991 situation where Plaintiff kept $600 sent to him while he was out of prison by an Aryan Brotherhood (AB) inmate for the purchase of LSD, which Plaintiff was supposed to smuggle in to ASPC-Florence, Central Unit. (Id. ¶ 44.) Plaintiff named seven inmates that he believed were a threat to him. (Id.)

A PS review was conducted. (Id.) DW and Warden recommended alternative placement away from Rincon. (Id. ¶¶ 45, 46.) It was noted that Plaintiff had not been assaulted or told to leave Rincon by other inmates; he was concerned because an inmate asked to see him. (Id.) Plaintiff identified the inmates he felt threatened by and the recommendation was to add the inmates to his DNHW list and to transfer him to another GP location. (Id.) The warden also noted that the investigation did not disclose a contract to assault Plaintiff or a larger conspiracy to harm him. (Id. ¶ 46.)

The PS Committee assigned Plaintiff to alternative placement away from Rincon and added names to his DNHW list. It noted that information regarding the alleged threat was self-reported and unconfirmed by prison staff. (Id. ¶ 47.) The PS Committee also noted that Plaintiff has a release date of 2035 and, therefore, it was in his best interest to try to adapt to another GP yard. Plaintiff did not appeal the placement decision. (Id.)

### c. 2008 PS Request

On January 10, 2008, Plaintiff requested PS after being assaulted by another inmate

| | |
|---|---|
| 1 | when he was moved to the ASPC-Yuma, Cheyenne Unit ("Cheyenne"). (Id. ¶ 47.) The PS |
| 2 | review process was initiated. (Id.) Plaintiff was interviewed by CO IV Sanders on |
| 3 | January 28 and told Sanders that an inmate sent Plaintiff $3,000 when he was "on the streets" |
| 4 | and he was supposed to buy heroin and acid and send it back in. He never did, and now |
| 5 | "they" want to kill him. (Id. ¶ 48.) Plaintiff claimed that one of the people who knew about |
| 6 | the deal was at Cheyenne and that Plaintiff would have been assaulted eventually by him. |
| 7 | (Id.) Plaintiff told Sanders that he does not "do drugs," he only owes the $3,000. (Id. ¶ 49.) |

On February 21, Watson, the associate DW at Cheyenne, recommended alternative placement. Plaintiff had viable alternative placement opportunities and inmates deemed a threat to him as a result of the investigation had been added to his DNHW list. (Id. ¶ 50.) On March 7, Sternes, the warden at the ASPC-Yuma, also recommended alternative placement with inmates' names added to Plaintiff's DNHW list. (Id. ¶ 51.) Sternes noted inconsistencies in Plaintiff's stories over the years about the alleged debt owed and the amount owed, indicating that the inconsistencies called into question the validity of the claims. (Id. ¶ 52.) Sternes also noted that Plaintiff's institutional file indicated that he had been involved in drug activity during this commitment and his drug dealings resulted in two other inmates requesting protection. (Id.) Plaintiff was found to be in possession of a cell phone while housed at the ASPC-Lewis. (Id.) Sternes noted that Plaintiff "has been documented to be an aggressor, drug dealer and smuggler of contraband into the prison system. He has a continued issue with either selling or owing money from drugs. I believe this is more likely the reason for his issue this time, than a 17 year old debt that may not be real." (Id. ¶ 53.)

On March 31, 2008, the PS Committee, chaired by Haley, denied Plaintiff PS status and approved him for alternative placement, noting that other options should be considered. (Id. ¶ 54.) The PS found that inconsistencies in Plaintiff's allegations throughout the current and previous investigations undermined the validity of his claims as they related to the underlying reason he had been threatened and assaulted. (Id. ¶ 55.) It was also noted that Plaintiff's alleged assailant had no documented STG or gang affiliation. (Id.)

1    Plaintiff appealed the PS Committee's alternative-placement decision and on
2 April 30, Rollins, the Deputy Division Director for Prison Operations, responded. (Id. ¶ 57.)
3 Rollins noted that Plaintiff claimed his issues started in 1991 due to owing a debt to the
4 Aryan Brotherhood, but when he first requested PS in 2006, he claimed to owe a debt to
5 Hispanic inmates; that the allegations had been inconsistent and unverified; and that there
6 was no indication that Plaintiff's issues are STG- or gang-related or that a statewide threat
7 existed. (Id. ¶¶ 58-59.) He pointed out that Plaintiff had been housed at the ASPC-Yuma,
8 Dakota Unit, for six months with no issues, which indicated that he could be safely housed
9 among GP inmates. (Id.) All inmates described by Plaintiff to be a threat had been placed
10 on his DNHW list and he could be safely housed at another location. (Id.) Finally, Rollins
11 said there had been no new information provided to compel him to change the decision of
12 the PS Committee. (Id.)

13    Defendants argue that Plaintiff is not entitled to relief as to Schriro because he alleges
14 no personal involvement by her and admitted that he sued her only because she was Rollins
15 and Haley's supervisor. (Doc. #37 at 10-11, ref. DSOF ¶ 61, Pl Dep. 15:2-5.) As to Franco,
16 Watson, Miller, Crouch, and O'Bryant, Defendants argue that the PS Committee has the final
17 say on Plaintiff's 2008 PS request and the other Defendants were merely steps on the way
18 to the PS Committee's decision. (Doc. #37 at 12.) Watson recommended alternative
19 placement and O'Bryant's only involvement was to notify Plaintiff of his appeal rights. (Id.
20 at 13.)

21    Regarding Haley, Defendants assert that although Plaintiff blames the PS Committee
22 for denying his 2008 request, Plaintiff does not allege that he has been assaulted since that
23 denial. Instead, Plaintiff claims that he was assaulted in the past and "perpetually assigned
24 to locations where it will and does continue psychological and emotional mental trauma,
25 decline health, substantial financial loss, property loss, loss of privileges and immunities."
26 (Id. at 13.) Defendants argue that a failure to protect against future harm is not a cognizable
27 damages claim under § 1983. (Id.) They also argue that Haley responded reasonably to
28 potential the threat to Plaintiff. (Id. at 14.)

**2.    Plaintiff**

In opposition to Defendants' motion, Plaintiff submits his response (Doc. #41), his Statement of Facts (Doc. #42 (PSOF)), Exhibits (Doc. #43), his declaration and the declaration of Shirley Rau (Doc. ##45, 46).

Plaintiff asserts that alternative placement is not a viable alternative to PS when a group of inmates assaults Plaintiff repeatedly. (Doc. #42, PSOF ¶ 1.) He asserts that his case spans five years, three different prison yards, and nine inmates added to his DNHW list, "8 white men, 3, I know of are part of the 'A.B.'" (Id.) He alleges that in all of his PS cases, a complete review was done "which in itself proves [his] case was believed and warranted." (Id. ¶ 2.) He disputes that being moved to a Detention Unit after requesting PS is the same as being isolated because inmates are then confined with 100 to 150 other inmates and all other inmates in the CDU can see the inmate and know why he is there . Plaintiff asserts that GP and PS inmates are housed there. (Id. ¶ 3.)

Plaintiff contends that when he was sent to Cheyenne in Yuma, he was attacked immediately and no amount of DNHW designations will correct the problem. (Id.)

Plaintiff also denies that he is a White Supremacist or that he belongs to a gang or that he owed the Mexican Mafia $2,500. (Id. ¶ 4.) He told prison officials that he owed $1,000 to a Mexican. He was told to buy dope. He claims that he did not request PS in 2005 because he needed time to find out how serious the issue had become. (Id.) In December 2008, Plaintiff touched a guard so that Plaintiff would be charged with an A-1 violation and put in a single cell. (Id.)

As to the 2007 PS request, Plaintiff notes that although officials stated that the investigation did not uncover a contract or large conspiracy to harm him, he was moved and seven people were added to his DNHW list. (Id. ¶ 5.) Regarding the 2008 PS request, Plaintiff claims that he is being run from one yard to another by assaults, threats, and extortion "in hopes they'll forget about me. I have a news flash for you. They have not forgotten. It's been 19 years since this transpired." (Id. ¶ 6.)

Plaintiff asserts that the only thing Defendants rely on is the inconsistencies in the

- 10 -

1  amounts of money.  He claims that he told officials the money came in different checks with
2  possibly $600 the first time and up to $2,000 or $3,000 over the next six months.  (Id. ¶ 7.)
3  His mother Shirley Rau attests that someone came to the house in search of Plaintiff
4  regarding the debt.  (Id. ¶ 8.)

5  Plaintiff alleges that all the inmates on his DNHW list are gang affiliated.  (Id. ¶ 9,
6  Doc. #43, Attach. 1.)  He notes that Rollins claimed that there was no indication that
7  Plaintiff's issues are STG- or gang-related, but that Sergeant DeFranco noted that inmates
8  who threatened Plaintiff were "all affiliated with A.B. gang."  (Id. ¶ 13, Attach. 5.)

9  Plaintiff claims that under Haley, fewer inmates were admitted to PS than ever before
10 and that more people had been let out into the yards and assaulted.  (Id.)  He also claims that
11 Sgt. Lopez knows that Plaintiff only assaulted a guard in order to be put in a safe place.  (Id.)

12 Plaintiff concludes that he has been assaulted several times, his safety issue is
13 ongoing, and he is and will be an STG target for his actions.  (Id. at ¶ 18.)  In Central Unit,
14 he has been threatened by several inmates, whom he identifies.  (Doc. #45, Pl. Decl. ¶ 12.)
15 He says that these inmates have sent kites to him and have said they are going to get him.
16 (Id.)

### 3.  Reply

As to Schriro, Franco, Watson, Miller, Crouch, and O'Bryant, Defendants argue that nothing in the Complaint or summary judgment response connects any of these Defendants with affirmative conduct depriving Plaintiff of his constitutional rights. (Doc. #48 at 3.) As to Haley, Plaintiff's complaint is that Haley was chair of the PS committee that denied Plaintiff's 2008 PS request and placed Plaintiff on a different yard. Defendants contend that Plaintiff disagrees with that decision and asserts that alternative placement does not work. Defendants argue that there is no dispute that Haley evaluated Plaintiff's case, and they further assert that Haley acted reasonably regarding the risk. (Id. at 4.)

### C.  Analysis

The Court finds that Defendants are entitled to summary judgment. They offer evidence that they were not deliberately indifferent to Plaintiff's safety concerns, and

Plaintiff fails to establish a material dispute of fact as to their alleged deliberate indifference with regard to the 2008 PS denial. As previously noted, Plaintiff's claims as to the 2005 and 2007 PS denials were dismissed and the facts regarding those matters are relevant only insofar as they relate to the 2008 decision and Plaintiff claims that his continued placement in alternative housing rather than PS was deliberately indifferent to his safety needs.

Plaintiff complains that, in 2008, Rollins ignored STG affiliations of those on Plaintiff's DNHW list. But Rollins was never served and will be dismissed on those grounds. A review of the paperwork related to the PS 2008 request demonstrates that Schriro, Franco, Miller, Crouch, and O'Bryant had nothing to do with that particular PS process. Plaintiff offers no evidence of any conduct by these Defendants in connection with the 2008 PS request.

DW Watson, Warden Sternes,[3] and Haley were involved in the process and all recommended alternative placement. The PS Decision Worksheet signed by Watson shows that he considered the Cheyenne assault as well as the previous assault, that he determined that alternative placements were available, and that inmates deemed a threat would be added to Plaintiff's DNHW list. (Doc. #50, Ex. B, Attach. 13.) Likewise, Sternes' review shows that he also recommended alternative placement. (Id., Attach. 14.) He also stated that the inconsistencies in Plaintiff's stories might be small details, but they made Sternes question the validity of Plaintiff's claims. Sternes noted that Plaintiff was a documented aggressor and drug dealer who had a continued issue with selling or owing money for drugs, which Sternes believed to be the more likely reason for the current issue. Likewise, Haleys' review shows that the DW and Warden both agreed to alternative placement, the assailant had no documented STG affiliation, and Plaintiff would be placed away from inmates on his DNHW list. (Id., Attach. 15.) The review noted discrepancies in Plaintiff's allegations—presumably about the amounts of money owed and to whom.

Plaintiff appears to argue that because the complete PS review was done in all three

---

[3]Like Rollins, Sternes was not served and will be dismissed on those grounds.

of his cases, his claims were "believed and warranted" and he was entitled to be placed in PS for his safety. The Court disagrees. The fact that three reviews were conducted shows that prison officials thought Plaintiff's claims were serious enough to warrant investigation. Plaintiff does not dispute that investigations were in fact completed. Each time, prison officials assigned Plaintiff to a new yard and added names to his DNHW list; they did not ignore Plaintiff's concerns.

The Court finds that the evidence cited by Plaintiff's regarding an STG threat establishes only a self-reported STG threat. For example, the Criminal Investigative Report regarding the 2007 request states in a box designated "Allegations" the following: "03-STG-related." (Doc. #43, Attach. 1.) There are apparently inmate names, but they have been blacked out and there is a designation after the name stating Position: INMATE (active). Likewise, the DeFranco statement that those threatening Plaintiff are "all affiliated with Aryan Brotherhood" is made on a "Confidential – Protective Segregation Interview Assessment." (Id., Attach. 5.) In other words, it appears to be DeFranco's report of what Plaintiff told DeFranco. Even assuming that Plaintiff stole money in 1991 from a member of the Aryan Brotherhood, there is nothing to suggest that DeFranco conducted an independent investigation and determined that in 2007 Plaintiff was, in fact, being threatened by other inmates with AB affiliation.

Plaintiff claims the debt was incurred in 1991, but his problems did not arise until 2005. In addition, there is evidence, which Plaintiff did not dispute, that Defendants considered that Plaintiff had been dealing drugs since he was in prison. Thus, even without the inconsistencies in Plaintiff's story, it was not unreasonable for prison officials to conclude that Plaintiff's problems did not arise from the 1991 drug debts. More importantly, there is no evidence to suggest that Defendants actually perceived that Plaintiff was the target of an STG threat and ignored the danger to him. Haley specifically indicated that the assailant had no known STG affiliation. Plaintiff does not dispute this. In other words, there is no evidence that any Defendant was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed by not placing Plaintiff in PS, or that any

Defendant drew the inference. See Farmer, 511 U.S. at 837. Plaintiff's disagreement with the decision is not enough to demonstrate deliberate indifference. Plaintiff does not dispute that he was transferred, nor does he claim that Defendants failed to add requested names to his DNHW list. The Court concludes that Plaintiff has presented no probative evidence of Defendants' deliberate indifference as to the 2008 PS request.

Plaintiff claims that he has received subsequent threats while in Florence Central Unit. Even if these threats are part of the claims in the Complaint, there is no evidence that Plaintiff has reported them to prison officials, and specifically to Defendants. It is undisputed that Plaintiff has not been assaulted.

As to his claim that repeated requests for PS review alerts inmates in GP of his status and increases the risk to him, Plaintiff presents almost no evidence. He claims that inmates know he is in CDU during the PS investigation process, but he states that inmates other than PS inmates are housed in CDU, so it is unclear why other inmates would know of PS reviews simply because of assignment to CDU. And Plaintiff's claim that PS review followed by alternative placement puts in him greater danger is somewhat inconsistent with Defendants' undisputed evidence that Plaintiff did not ask for PS after the 2005 review or appeal the alternate placement as to the 2007 request.

Moreover, there is no evidence that alternative placements and DNHW lists are so deficient that the PS process is itself deliberately indifferent or that Defendants are aware of this threat as to Plaintiff in particular or all inmates. See Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (a policy may be so deficient that the policy "itself is a repudiation of constitutional rights" and is "the moving force of the constitutional violation."). "Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial, criminal, and often violent, conduct." Hudson v. Palmer, 468 U.S. 517, 526 (1984). Under Plaintiff's theory, anyone who had ever been in the PS process would have to be kept there for the duration of his sentence. "In deciding how to protect a prisoner, officials may face a number of choices, each posing potential dangers to the prisoner and others. Choosing the optimal 'prophylactic or preventive

measures' to prevent violence and maintain safety is difficult and not readily susceptible to judicial evaluation." Berg v. Kincheloe, 794 F.2d 457, 461 (9th Cir. 1986), citing Whitley v. Albers, 475 U.S. 312, 322 (1986).

The Court finds that Defendants were not deliberately indifferent to Plaintiff's safety. It need not consider Defendants' remaining arguments.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants Rollins and Sternes' Motion to Dismiss (Doc. #36) and Defendants Schriro, Franco, Watson, Miller, Haley, Crouch, and O'Bryant's Motion for Summary Judgment (Doc. #37).

(2) Defendants' Motion to Dismiss (Doc. #36) and Defendants' Motion for Summary Judgment (Doc. #37) are **granted**.

(3) Defendants Rollins and Sternes are **dismissed without prejudice** and the claims against Schriro, Franco, Watson, Miller, Haley, Crouch, and O'Bryant are **dismissed with prejudice**.

(4) The action is terminated, and the Clerk of Court must enter judgment accordingly.

DATED this 24th day of June, 2010.

David G. Campbell
United States District Judge

- 15 -